```
1   STATE OF ILLINOIS    )
                         )  SS:
2   COUNTY OF C O O K    )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
         COUNTY DEPARTMENT - DOMESTIC VIOLENCE DIVISION
4
                                )
5   JOHN CERASANI,              )
                                )
6      Petitioner,              )
                                )
7        v.                     )  No. 23 OP 31167
                                )
8   VALERY AHRENS,              )
                                )
9      Respondent.              )

10
                    EMERGENCY ORDER OF PROTECTION
11

12              REPORT OF PROCEEDINGS of the hearing had

13  before the Honorable JOEL L. GREENBLATT, Judge of said

14  court, on the 6th day of December, A.D., 2023.

15  APPEARANCES:

16          The Petitioner, in open court,
              appeared Pro Se;
17
            No One in Open Court,
18            appeared on behalf of Respondent.

19

20

21

22  Julianne E. Halm, CSR
    2121 Euclid Avenue - Room 237
23  Rolling Meadows, IL 60008
    Official Court Reporter
24  License No. 084-00354
```

1      THE COURT:  Next matter, 23 OP 31167.  John

2   Cerasani.

3                        (Witness sworn.)

4      THE WITNESS:  Yes.

5                        JOHN CERASANI,

6   having been first duly sworn, was examined and testified

7   as follows:

8                        EXAMINATION

9                        BY THE COURT:

10     Q.   Please put your hand down.  Tell me your name,

11  sir.

12     A.   John Cerasani.

13     Q.   Sir, how do you know an individual named

14  Valery Ahrens?

15     A.   We had a dating relationship about a year ago.

16     Q.   Who is Anastasia Cerasani?

17     A.   My daughter.

18     Q.   Is it Mia Mclin?

19     A.   Correct.

20     Q.   M-c-l-i-n.  Who is that person?

21     A.   My girlfriend that lives with me.

22     Q.   She lives with you?

23     A.   Yes.

24     Q.   And who is Jacob Cerasani?

```
 1       A.   My 15-year-old son.

 2       Q.   Does he live with you as well?

 3       A.   Yes.

 4       Q.   Thank you.  Sir, you were before me recently.

 5  You had a stalking order, did you not, sir?

 6       A.   We had an emergency order of --

 7       Q.   Had an order of protection.  Okay.  And that

 8  was dismissed; correct?

 9       A.   Correct.

10       Q.   And you are now filing what we call a stalking/

11  no contact order; correct?

12       A.   Correct.

13       Q.   Thank you.  You have to satisfy me on at least

14  two or more occasions, there's been stalking behavior

15  committing by Ms. Ahrens.

16            So give me the most recent event first:

17  yesterday; two days ago; a week ago?

18       A.   Most recent event would have been December 4th

19  at 1:30 in the morning.

20       Q.   Of this year, December 4th?

21       A.   Two days ago, yeah.

22       Q.   What happened on December 4th at 1:30 in the

23  morning?

24       A.   I was out of town.  A car drove up into my
```

1    driveway.  Inverness police had to be called about the

2    situation.  I called 911 --

3         Q.  A car drove up.  How does that relate to

4    Valery Ahrens?

5         A.  If you look at what's been going on the last

6    two years, this is what she does.  She posts on

7    Instagram to try to recruit people to intimidate and

8    harass me.  And my kids -- the Inverness Police

9    Department were at our house overnight.  And it stopped

10   temporarily, Judge, for a few weeks when we had that

11   emergency order --

12        Q.  Okay.  Hang on.

13        A.  -- of protection that we dismissed.

14        Q.  Hang on a second, sir.

15        A.  Yeah.

16        Q.  So a car came into your driveway?

17        A.  Correct.

18        Q.  You were not there.  You saw it on your cameras

19   or whatever?

20        A.  My kids called me screaming and crying that --

21        Q.  Said that there's somebody in the driveway?

22        A.  Yes.

23        Q.  How did that interaction end?  Were the police

24   called?  Did somebody --

1    A.   The police came.  The car drove off.

2    Q.   They drove off?

3    A.   Yeah.

4    Q.   No one was apprehended or spent -- you don't

5 know --

6    A.   No.  The Inverness police are very familiar

7 with the situation.  So, to where you're driving at,

8 no, I do not know --

9    Q.   You don't know who it was?

10    A.   Correct.  They do not -- you have to know --

11    Q.   A strange car went into your driveway and

12 then backed out and left?

13    A.   Correct.  So what's interesting, sir -- you

14 have to know -- that's the most recent; that's the

15 reason I brought that up.

16         For the two months that I had the emergency

17 order of protection and it was vacated, none of this

18 was happening.  It was happening all the time before,

19 all the time after.  So as soon as it got vacated,

20 we've returned to square one with how my kids -- we

21 don't sleep in our house, and if --

22    Q.   What do you mean you don't sleep in your

23 house?

24    A.   We don't -- we're scared for our lives.  She's

1    texted me that she's going to murder me --

2         Q.   If I'm not mistaken, doesn't the young lady

3    live in Iowa?

4         A.   Sir, she has police calling me and following

5    me.

6         Q.   Does she live in Iowa?

7         A.   Yes.

8         Q.   Thank you.  How do you know -- somebody is

9    following you.  Who?

10        A.   Many people.  She recruits them from social

11   media.

12        Q.   How do you know that?

13        A.   Because she posts about it in her own words.

14   She says --

15        Q.   She says I'm going to get somebody to follow

16   John Cerasani?

17        A.   No.

18        Q.   What does she say when you say she posts?

19        A.   Who knows where John Cerasani was the other

20   night?  Please reach out, and then she starts

21   proactively messaging people.  She's put on her

22   Instagram account the name of John Cerasani so people

23   stumble across the page.

24        Q.   So it's her page under your name?

1       A.   Correct.

2       Q.   So they think they're communicating with you?

3       A.   Initially.  And then she, like, researches

4   them -- there's a mental issue here.  There's been --

5   she researches them, tries to figure out how they know

6   me, and then will start messaging me, hey, if they

7   don't -- if they have any ill will toward me -- hey,

8   just so you know, John sexually abused me, all which is

9   false.

10      Q.   Do any of these people actually contact you?

11      A.   Yes.

12      Q.   My question to you is, when they contact you,

13  do you speak with them?  Do you find out the genesis

14  of why they're reaching out to you?

15      A.   Yes, yes.

16      Q.   Do you have names of people?

17      A.   Sal DiFranco.  Yes.

18      Q.   The answer is yes?

19      A.   Yes.

20      Q.   Is it one or more than one?

21      A.   Of actual, like, names of -- like four or five.

22  I think most people will come across it and not even

23  bring it to my attention, because they realize she's

24  crazy.

1      Q.   Well, the reason I ask is -- subjunctive

2  case -- if I grant you relief, you have to be prepared

3  to prove that it was Ms. Ahrens who told those people

4  to contact you and do X, Y and Z.

5      A.   Okay.

6      Q.   So is that person who contacted you --

7      A.   So that's why probably I could get them too,

8  but I don't think I'm going to need to, because I have

9  test messages directly from her saying I'm going to

10  murder you, I'm going to rape you, I'm going to extort

11  you.

12      Q.   How recent are those messages?

13      A.   Up until the time that the order of protection

14  was put in place.  August 16th.  I mean, that's the

15  only reason I'm here now, is because we have --

16      Q.   No, I see you've attached voluminous

17  attachments.  Understood.

18      A.   I was trying to avoid embarrassing anybody,

19  sir, and --

20      Q.   I beg your pardon?

21      A.   I was trying -- I don't know if you're going

22  to end up having to read that or not, but I was trying

23  to avoid embarrassing somebody here, because there was

24  really private things there were going on between us in

1    our relationship.

2        Q.   I remember it from the order of protection.  I

3    read all of the pleadings.  They were lengthy, over

4    100 pages of materials.  I read every page, and I

5    realize that there was some sexually explicit things

6    that had taken place, and I understand that.

7            But if you are entitled to protection under

8    the statute, then I will grant that, and that's what

9    I'm trying to find out, if you're entitled to it on an

10   emergency basis.

11       A.   Got it, your Honor.

12       Q.   So people who contacted you, did they say --

13   when you said why are you contacting me and they said,

14   oh, because I saw such and so, did you ask them, well,

15   how --

16       A.   So one situation, I was dating the gentleman's

17   ex-wife, and he was contacted --

18       Q.   That's the police officer?

19       A.   Correct.

20       Q.   Sal?

21       A.   Exactly.  And he had told me that him and

22   Valery had been in touch daily for about 45 days, and

23   he understands why -- and he was -- basically threatened

24   me that I can't be around her kids because I abuse

1    women and I'm a drug addict and -- more or less.  I

2    don't want to accuse him of something in open court,

3    but it wasn't a pleasant conversation.  We worked it

4    out outside of court, but he would have no reason to

5    be associated with me or think these things about me

6    had she not been proactively contacting him.  And this

7    is this like her mousetrap, sir, and this is what she

8    does.

9            And, also, if I could say one quick thing, sir.

10       Q.   Go ahead, sir.

11       A.   I want to apologize.  Last time I was in

12   court -- I just want to be really clear.  I was never --

13   this probably happens to you every day, so it's no big

14   deal for you, but I -- I was frustrated not because of

15   anything you were saying.  I was very frustrated with

16   my lawyer, and that's why you don't see him here today.

17           She submitted a 130-page motion to vacate.  My

18   lawyer laughed that thing off, sir.  Okay?  He goes,

19   this is crazy.  She is a criminal, she's not going to

20   testify.  There's no way Greenblatt vacates this order.

21   There's no way.  So we give a half-ass response.  I

22   have all this evidence here.  He doesn't submit it to

23   you.

24           THE COURT:  Sir -- again, I'm not -- I'm not

1  passing any judgment on what went on before or the

2  lawyer or anything like that.  I'm just --

3      A.   I just want to apologize --

4      Q.   -- concerned --

5      A.   I want to apologize to you.

6      Q.   There's no apology necessary, sir.

7      A.   Okay.

8      Q.   I'm just directing my attention to this new

9  matter that's before me and whether or not you are

10  entitled to this relief.  That's the only issue before

11  me.

12      A.   Okay.

13      Q.   So stay right there.

14      A.   I also received this cryptic text -- a text

15  from her December 5th.

16      Q.   How do you know it's from her?

17      A.   I don't.  I don't.

18      Q.   You received a text?

19      A.   Yeah.  I had posted something --

20      Q.   Okay.  Is that in your paperwork?

21      A.   I didn't even include that because --

22      Q.   What was the text on December 5th?

23      A.   Rockford, eh?  You're not gonna get off that

24  easy --

1      Q.   I'm sorry.  Say again?

2      A.   She made an implication, Rockford, eh?  You

3   think you're gonna get off that easy, is what she said.

4      Q.   Okay.  I remember there was a meeting that you

5   had in Rockford, the one and only time you said you met

6   with her.

7      A.   She said that.  I didn't say that, by the way.

8   That's why --

9      Q.   In person?

10     A.   That's why I'm mad at my lawyer.

11     Q.   In person?

12     A.   Sir, I never got to argue that whole side of

13   it, but --

14     Q.   Okay.  She said in her papers that there was

15   only one time in person?

16     A.   Uh-huh.

17     Q.   Sometime -- I believe it was in February --

18     A.   Yes.

19     Q.   -- in Rockford?

20     A.   But she's referring to something totally

21   different now.

22     Q.   Okay.

23     A.   Through her little stalking efforts on

24   Instagram, she found out that I'm going to be starting

1  to film my podcast from a studio in Rockford.  And

2  suddenly, I get some random text from a burner number --

3  she sends me that fake number all the time -- implying

4  that.  And then that was coupled with the day before,

5  the driving in.  So it's like --

6      Q.  With what?

7      A.  With the car driving into the parking lot

8  24 hours before that.

9      Q.  Okay.  Stand by for one minute.  Catch your

10  breath.  I want to read some of these papers.

11      A.  All right.

12      Q.  If I may inquire, sir, how old are you?

13      A.  I just turned 47 yesterday.

14      Q.  And how old is this young lady?

15      A.  41 -- 42, I think now.

16      Q.  Okay.

17      A.  And if you remember, her 130-page motion

18  included all this free speech language.  My lawyer --

19      Q.  I do remember, yes.

20      A.  He didn't know which part to respond to and

21  just kind of gave her this vague thing.  And I look at

22  the thing, and I'm like, That's our response, Nick?

23  And he's like, John --

24      Q.  I don't want to go into that, sir.  That's

1   long over.

2       A.   Okay.

3       Q.   So it's your testimony that she has, in fact,

4   caused other people to contact you; correct?

5       A.   Correct.  And put my family in danger.

6       Q.   Have there been any threats made by any of

7   these other people that she put in touch with you to

8   you or your family?

9       A.   Yeah.  I would call what happened with the

10  Chicago officer.

11      Q.   With this gentleman, Sal?

12      A.   Yeah.

13      Q.   Who you believe --

14      A.   And I'm only choosing my words with that

15  because we kind of worked it out outside of her, but

16  now she's moving on to new people.  I don't want to,

17  like, drag him into this.

18      Q.   I understand, but -- I'm aware of the free

19  speech issues.

20      A.   Okay, gotcha.

21      Q.   Okay.  And there are -- there is and there is

22  protected speech, and unless you can prove that it was,

23  in fact -- some behavior was directed toward you as a

24  result of the speech --

1      A.   Yes.

2      Q.   That's the issue.  You could create a website,

3  Judge Greenblatt is an idiot.

4      A.   Right.

5      Q.   And objectionable as it may be, you have a

6  right to do that.

7      A.   Right.  So, like, I can't prove it, but also,

8  just so you're aware, "Judge Greenblatt is an idiot"

9  is the name of the Instagram handle, but then you put

10  your real name as the name.  She has John Cerasani is a

11  narcissist, and then, the real name that's John

12  Cerasani.  Like, she just -- so anybody that looks me

13  up is gonna --

14      Q.   I understand, sir.  I understand.

15      A.   And then she engages with them.

16      Q.   I appreciate that, but the issue is whether or

17  not just that creation -- it's like a Yelp review.

18      A.   I understand.

19      Q.   You know, I went to Restaurant X, and they

20  served terrible food and their service was lousy.  I

21  can post that.

22      A.   Yes, yes.

23      Q.   That's free speech?

24      A.   I understand.

1    Q.   Okay?

2    A.   I think this will -- I think it will be clear.

3    If she -- if she can attest to this, she'll go there,

4    and I think any lawyer is going to look at it and be,

5    like, they're not going to defend her on it.

6    Q.   Well, I understand.  I understand.  All right.

7    A.   Just an FYI, too, that lawyer recused himself

8    from the case.  That's why she switched lawyers.  The

9    lawyer that made the whole -- he was a pro bono First

10   Amendment rights --

11   Q.   I remember.  Some young lady came in.  Again,

12   that's history.

13   A.   Yeah.  I'm just saying the whole freedom of

14   speech defense was this lawyer from the nonprofit that

15   didn't know all the details, and that's why he -- when

16   the details came out and she got arrested, all of a

17   sudden, he didn't exist anymore.  And she also swore

18   under oath -- I'm sorry.

19   THE COURT:  Mr. Cerasani, there's not enough here

20   for an emergency order.

21   THE WITNESS:  Okay.

22   THE COURT:  However, I am going to allow your

23   papers to remain on file.

24   THE WITNESS:  Okay.

1      THE COURT:  I'm going to order you to have her

2   served with process.

3      THE WITNESS:  Okay.

4      THE COURT:  To bring her to court so we can get to

5   the bottom of this.  But, understand, I'm not entering

6   an order today.

7      THE WITNESS:  Okay.

8      THE COURT:  Merely leave to file is granted.  Serve

9   respondent, and I'll give you a date to return to court.

10     THE WITNESS:  Okay.

11     THE COURT:  Okay?

12     THE WITNESS:  Yeah.

13     THE COURT:  So stand by.

14     THE WITNESS:  Would I have been able to do that

15  for previous subpoenas?  We never had a plenary or

16  evidentiary hearing with the order of protection side

17  of it.  Would I have been able to request a regular

18  hearing for that?  I was told I would be wasting my

19  time --

20     THE COURT:  For what?  For the old case?

21     THE WITNESS:  So I wasn't able to contest the idea

22  that we weren't in a dating relationship, is what you

23  ruled --

24     THE REPORTER:  Are we on the record?

 1      THE WITNESS:  And you had never seen any of the

 2  evidence --

 3      THE COURT:  Yeah, put it all on the record.

 4      THE WITNESS:  You had never seen any of the

 5  evidence that I had on mine because my lawyer didn't

 6  submit it, so I --

 7      THE COURT:  I believe more than 30 days have

 8  elapsed, if I'm not mistaken.

 9      THE WITNESS:  I don't know.

10      THE COURT:  I'm pretty sure, and so, with the

11  elapsing of more than 30 days, that's been put to bed.

12      THE WITNESS:  Okay.

13      THE COURT:  Okay?  So leave to file granted.  Serve

14  the respondent.  And on the order of the Court, I will

15  extend this to the three-week date to December 27th.

16           Now, in a moment, you'll be seated on the

17  bench.  The clerk will process your papers.  The sheriff

18  is going to give them back to you.  Take them back to

19  the ladies in the window, Room 123.  You were down

20  there a little while ago, the sheriff's ladies.  Place

21  the papers there for service.  Give them the

22  information, she lives in Iowa.  They'll tell you how

23  to get her served.

24      THE WITNESS:  Okay.

1      THE COURT:  That's step one.  Next, you come back

2  to this courtroom three weeks from today, the 27th at

3  1:30.  Because it's going to be status on service only,

4  I'm going to let join on Zoom so you don't have to

5  waste a trip to the courthouse.  Sheriff, you should

6  have the Zoom paper in the front of the podium with all

7  the Zoom numbers.

8      THE DEPUTY SHERIFF:  Yes, Judge.  Right here.

9      THE COURT:  Thank you.  Find Room 207 on there.

10  There's the I.D. and password.

11      THE WITNESS:  Right.

12      THE COURT:  Okay?  Room 207 at 1:30 on

13  December 27th.

14      THE WITNESS:  Okay.

15      THE COURT:  Let's get her in here and let's see

16  where we're going.

17      THE WITNESS:  Does she have to show up to that

18  then, or --

19      THE COURT:  After she's served, she has to make

20  an appearance.  If she does not make an appearance,

21  either on Zoom or in person, then after she's served,

22  then I can issue a default order.  I'm assuming she

23  will make an appearance.

24      THE WITNESS:  So the Inverness police have

1  additional charges that they haven't arrested her on

2  because she hasn't been in town.

3      THE COURT:  I have -- I have nothing to do with

4  that.

5      THE WITNESS:  But it just -- so on the last time

6  we did this and she showed up to court and found herself

7  arrested after she got into court.  So just I'm

8  wondering, is there any way that she's not allowed

9  to do Zoom so she has to come here, so she can be

10  arrested again if necessary?

11      THE COURT:  I don't know anything about being

12  arrested for anything, quite honestly.  I don't know.

13      THE WITNESS:  Is she allowed to show up on the

14  27th on Zoom?  Could we waive -- does she have to be

15  here in person and not Zoom?

16      THE COURT:  No.  There's no requirement that she --

17  right now that she be here in person.

18      THE WITNESS:  Okay.

19      THE COURT:  Okay?  I don't know any -- about

20  criminal cases or anything -- I thought there was a --

21  isn't there a harassment through telephone

22  communication?

23      THE WITNESS:  That was the first charge, and then

24  they tried to do the second charge.

 1      THE COURT:  What happened to that case?  Is that

 2  still pending?

 3      THE WITNESS:  December 11th.  And, sir, Caroline

 4  Kennedy is not allowed -- she normally would have issued

 5  a criminal order of protection in this situation, but

 6  because there was already a civil in place before that

 7  arrest, and now that that civil got thrown away, she

 8  said she won't put the criminal in.

 9      THE COURT:  Correct.  Correct.  You can't have two.

10      THE WITNESS:  Yeah.  All right.

11      THE COURT:  And, plus, this is a different order.

12  This is a stalking order.

13      THE WITNESS:  I understand.

14      THE COURT:  You understand the difference?

15      THE WITNESS:  I do.

16      THE COURT:  The difference is that this is for

17  conduct that's not covered under Illinois Domestic

18  Violence Act, and under Illinois Domestic Violence Act,

19  there has to a certain relationship.

20      THE WITNESS:  Yep.

21      THE COURT:  That's what we talked about before:

22  dating, children in common, share a dwelling, related

23  by blood or marriage.

24      THE WITNESS:  Right.

1      THE COURT:  Okay.  And this does not require that

2  relationship, and that's why you're filing it under this

3  statute.

4      THE WITNESS:  And I appreciate that.

5      THE COURT:  Okay.

6      THE WITNESS:  If she violates this, does this have

7  the same kind of --

8      THE COURT:  After -- it does.  It's a Class A

9  misdemeanor, violation of a stalking/no contact order.

10  It is an arrestable offense; however, only after

11  service of summons and after the issuance of an order.

12  So right now, there's no order, so she can't be guilty

13  of violating anything.

14      THE WITNESS:  Got it.

15      THE COURT:  Yet.

16      THE WITNESS:  Got it.

17      THE COURT:  We don't know if there is going to be

18  an order.  That's going to be when we get both parties

19  before the Court.

20      THE WITNESS:  Okay.  And then I don't need to

21  prepare for a hearing on the 27th?

22      THE COURT:  Correct.  You do not.

23      THE WITNESS:  Okay.

24      THE COURT:  You'll have a seat, you'll get your

1  papers.  Take them back to the ladies.

2       THE DEFENDANT:  Thank you.

3       THE COURT:  You're welcome.

4                          (The case was continued to

5                          December 27, 2023.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   STATE OF ILLINOIS    )
                          )   SS:
 2   COUNTY OF C O O K    )

 3              I, Julianne E. Halm, Official Court

 4   Reporter for the Circuit Court of Cook County, Illinois,

 5   Municipal Department-Third Municipal District, do hereby

 6   certify that I reported in shorthand the proceedings had

 7   in the aforementioned cause; that I thereafter caused

 8   the foregoing to be transcribed into computer-aided

 9   transcription, which I hereby certify to be a true and

10   accurate transcript of the proceedings had before the

11   Honorable JOEL L. GREENBLATT, Judge of said court.

12

13

14                        Julianne E. Halm
                          Official Court Reporter
15                        CSR No. 084-003545

16

17
     Dated this 20th day
18   of December, 2023.

19

20

21

22

23

24
```

**24**