UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

JOHN CERASANI, an individual,                )
                                             )
                    Plaintiff,                )
                                             )          CASE NO: 1:25-cv-02565
v.                                           )          (HONORABLE JOHN H. THARP JR.)
                                             )
                                             )
                                             )
VALERY J. AHRENS, an individual,             )
                                             )
                    Defendant.                )

## INTRODUCTION

1.    Plaintiff John Cerasani's Complaint is not a legitimate legal claim; it is the
continuation of a campaign of legal abuse. This action is the latest in a long pattern of vexatious
litigation, marked by shifting narratives, fabricated evidence, and duplicative filings across
multiple courts. For more than two years, John Cerasani has misused law enforcement and the
courts by making false police reports, recycling dismissed claims, and repeatedly pursuing
emergency protective order actions despite judicial rejection. The purpose of these filings has
never been to vindicate any genuine reputational interest or protect himself from actual threats.
Each one has been pursued with the same objective: to punish Defendant for ever speaking the
truth about Plaintiff's abuse and to weaponize the legal system in an effort to silence her.

2.    Even if Plaintiff's extensive trail of vexatious litigation were ignored, his Complaint
still collapses under Rule 12(b)(6). Plaintiff does not plausibly allege that Defendant authored or
published the anonymous online statements that make up the bulk of his complaint. Instead, he
repeatedly relies on the conclusory speculation of "upon information and belief." He likewise
fails to plausibly allege actual malice, damages, and falsity. He offers nothing more than
evidence free allegations and bare recitations of the legal elements of defamation. Conclusory

allegations are insufficient under the pleading standards established by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

3.     Plaintiff is a public figure who regularly boasts of having hundreds of thousands of social media followers. Having branded himself as an "influencer," John Cerasani has cultivated and monetized a persona built on self-promotion, vulgar boasting, and public excess. Yet, he cannot tolerate, and becomes enraged and censorious when he elicits anything less than the fawning praise to which he deems himself entitled. His reputation is already defined by his own conduct and is the subject of increasingly widespread criticism and mockery. John Cerasani cannot plausibly claim that any statements he now falsely attributes to Defendant have inflicted additional reputational harm.

4.     This lawsuit must be looked at in the context of the multiple serial filings that preceded it. Plaintiff has a seeming fixation with using the judiciary as his personal weapon. John Cerasani treats the courts as a stage for retaliation and control, not as a forum for justice. His Complaint rests on his latest set of evidence free accusations, not plausibility; on abuse of process, not legitimate claims. Because it fails under *Twombly and Iqbal* and exemplifies a quintessential pattern of vexatious litigation, the Court should take judicial notice of prior dockets and orders and dismiss with prejudice under Rule 12(b)(6).

## BACKGROUND

5.     **Overview.** Plaintiff John Cerasani's background narrative bears little resemblance to the facts. Defendant sets out the relevant history because Plaintiff's shifting accounts, repeated venue shopping, and misuse of emergency procedures explain why his federal complaint rests on speculation rather than facts sufficient to state a claim.

6. **Mr. Number Reports.** Plaintiff alleges that Defendant is "obsessed" with him and desires him. The opposite is true. Defendant has no interest in Plaintiff; she learned some time ago that his phone number is associated with multiple public reports on the Mr. Number application, which is commonly used to flag unsafe contacts, including men reported by sex workers as abusive. At least four such reports appear under his number, including one from the same month the parties first communicated. This is the same phone number from which Plaintiff later falsely alleged Defendant sent him threatening text messages.



7. **Threats Concerning Intimate Material.** On information and belief, Plaintiff's primary method of controlling women is to demand and collect intimate, increasingly degrading photos and videos and later threatening to disseminate them if he becomes angry and/or believes his control is slipping. Plaintiff threatened Defendant with dissemination of intimate material to her family. One example is shown in Exhibit B of Defendant's Motion for Judicial Notice (JN). Defendant refused to be silenced and spoke out. Her counsel also reminded Plaintiff that Illinois law prohibits nonconsensual dissemination of private sexual images.

8. **Non-Disclosure Agreements.** On information and belief, Plaintiff has used NDAs or non-disparagement agreements in prior relationships and appears to expect Defendant to agree to similar terms if she wants any hope he will ever cease his barrage of filings. Using serial litigation to pressure a party into surrendering her lawful speech is not a legitimate use of this Court's resources; it is abuse of process.

9. **Amended Narrative.** After the Court required him to proceed under his own name, Plaintiff amended his complaint. Earlier versions claimed he had only one prior state case before filing here. That was false. His latest iteration attempts to gloss over multiple prior cases and minimize his admitted contacts with Defendant's father.

10. **Contact with Defendant's Father**. Defendant is an adult who has not lived with her parents for over twenty years. Plaintiff has never met her father, yet located his contact information and repeatedly attempted to contact him. Defendant's father is 75 years old and a caregiver to Defendant's younger brother, who is severely autistic. Counsel requested Plaintiff cease contact, but he persisted through third-party calls and mail.

11. **Defendant's Response.** It is not evidence of "seeking relevance," as Plaintiff claims, for Defendant to defend herself against serial lawsuits. Defendant has moved for judicial notice of court records reflecting Plaintiff's litigation pattern.

### Procedural History of Plaintiff's State Filings

12. **First Emergency OP (Cook County).** Plaintiff filed his first emergency order of protection (OP) pro se in Cook County, which included false and baseless allegations, including that Defendant conducted a 'surveillance operation' on him in the Bahamas and somehow made a CPD officer follow and stalk him. (Exhibit A, JN). After Defendant appeared with counsel, she was arrested in the courthouse by Part-Time Officer JulieAnn Ferraro of the Inverness Police Department (Ferraro).

13. **Arrest Circumstances.** FOIA records later showed that only after Defendant filed her response did Plaintiff retain counsel, whom he then had contact Ferraro to request Defendant's arrest based on a single, months-old, out of context text message that was not even included in his complaint. No warrant had been issued. Defendant, with no prior criminal history, was later acquitted.

14. **First Dismissal**. On November 21, 2023, Judge Greenblatt dismissed Plaintiff's emergency OP. Plaintiff responded with belligerence, and the bailiff was required to remove him from the courtroom.

15. **Attempted SNCO (Cook County).** On December 6, 2023, Plaintiff sought an emergency stalking no contact order (SNCO) in Rolling Meadows. (Exhibit C, JN). He made reference to text messages but said he did not include them. When Judge Greenblatt asked how he knew Defendant sent them, Plaintiff admitted: "I don't." (Exhibit D, JN). The court denied emergency relief but set the matter for hearing. Plaintiff also asked the court to revoke

Defendant's Zoom option, stating he wanted Defendant to be forced to appear in person so he could attempt to have her arrested again.

```
 4      A.   I also received this cryptic text -- a text
 5   from her December 5th.
 6      Q.   How do you know it's from her?
 7      A.   I don't.  I don't.
 8      Q.   You received a text?
 9      A.   Yeah.  I had posted something --
10      Q.   Okay.  Is that in your paperwork?
11      A.   I didn't even include that because --
12      Q.   What was the text on December 5th?
13      A.   Rockford, eh?  You're not gonna get off that
14   easy --
```
————11————

```
 1      Q.   I'm sorry.  Say again?
 2      A.   She made an implication, Rockford, eh?  You
 3   think you're gonna get off that easy, is what she said.
```

16. **Forum Shopping to Winnebago County.** The next day, December 7, 2023, Plaintiff filed a new emergency OP in Winnebago County. (Exhibit E, JN). He checked boxes falsely indicating a dating relationship and falsely asserting no prior or pending protective orders. He now swore with certainty that Defendant sent the same texts he had just conceded that he could not attribute to Defendant the previous day. For the first time, he also alleged that

Defendant had sexually assaulted him, which he claimed had occurred more than ten months earlier.

17. **Police Report.** Plaintiff then went to the Rockford Police Department and filed a false police report alleging Defendant sexually assaulted him on February 1, 2023. FOIA materials show the report was referred to prosecutors, who declined to bring charges. (Exhibit G, JN).

18. **Return to Cook County**. On December 8, 2023, Plaintiff returned to Rolling Meadows, seeking reconsideration of the dismissal of his first OP and the recusal of Judge Greenblatt. The only difference between the Winnebago OP and the Cook County OP was that the Cook County OP included a "special" restraint on Defendant's speech that Defendant had argued was unconstitutional. (Exhibit H, JN).

19. **Parallel Burdens.** In December 2023 Defendant had to retain three separate lawyers to cover three separate hearings in two counties in one day: a status hearing in the criminal case, a Cook County SNCO hearing, and a hearing for the new Winnebago OP. At the Winnebago hearing, Plaintiff, again pro se, baselessly alleged that Defendant posted photos of his daughter online and suggested the new OP should "go along with" the new criminal charges he was hoping would result from his false police report.

20. **Dismissal with Prejudice (Cook County)**. Plaintiff retained new counsel; the Rolling Meadows court dismissed the SNCO with prejudice upon learning Plaintiff had sought relief in Rockford.

21. **Criminal Acquittal**. In January 2024, Defendant was acquitted of the unfounded criminal charge that Plaintiff had procured.

22.     **Dismissal in Winnebago.** On February 13, 2024, the Winnebago emergency OP was dismissed. Plaintiff's counsel stated that they were preparing another petition.

23.     **New Filing (Winnebago County)**. On February 16, 2024—three days after dismissal—Plaintiff filed another emergency SNCO in Rockford, despite the Cook County dismissal with prejudice approximately two weeks earlier. (Exhibit K, JN). He relied on the alleged December 2023 texts,  again swearing they were from Defendant despite his prior admission that he did not know who sent them.

24.     **Basis for Relief.**  The official transcript reflects that the Winnebago judge was not inclined to grant relief based on alleged conduct from more than a year earlier. Plaintiff then pivoted to the texts. The court granted emergency relief based primarily on the allegation that Defendant sent texts that she did not send.

### Service, Letter, and Further Escalation

25.     **Threatening Letter**. Defendant first learned of the February 16, 2024 SNCO after receiving a letter mailed to her home.  It was addressed to her father, postmarked days after the first scheduled status hearing. She was not in attendance because she had not yet been served. Handwriting on the envelope matched that of Plaintiff's 'assistant,' Bree Volpentesta. The letter was threatening in nature and repeatedly referenced Defendant's family. The letter contained sexually degrading themes that are strikingly similar to the narrative Plaintiff has advanced in this Complaint. (See Exhibit 1). On counsel's advice, Defendant contacted local police and the FBI. When Defendant contacted her local police, an officer then served the latest SNCO.

26.     **Pattern of Police Contact.** As described within (Exhibit B, JN) Plaintiff only knew Defendant's home address because he made a pretexting call to her local police. He has

since prompted more than thirty combined police and sheriff visits to her home as they attempted to serve his numerous filings. Plaintiff has described such tactics as "mousetraps."

27. **Police Reports and Alleged Violations.** When courts did not grant him the restriction on Defendant's speech that he sought, Plaintiff filed a police report with Ferraro describing his order as if it contained restrictions that it did not. He also alleged violations that were unfounded, prompting costly emergency hearings. One such allegation involved audio Plaintiff initially denied existed but that later surfaced. Plaintiff now seeks to re-litigate over alleged audio publishing.

28. **Cook County Docket Correction.** In December 2024, the Cook County docket was corrected to reflect what the transcript already showed: Plaintiff's SNCO petition had been dismissed with prejudice. Plaintiff's motion to alter the docket back was denied.

<u>**Spoofed Texts and Federal Filing**</u>

29.. **"Resolution" Efforts.** FOIA records show that Plaintiff told Ferraro about his plan to schedule a "resolution" meeting with Defendant before courts ruled against him.

30. **Late Disclosure of Texts.** On January 3, 2025, after more than a year of requests, Plaintiff produced screenshots of the alleged texts. They were not from Defendant's phone number. One screenshot showed Plaintiff had never before received a text from that number. He had manually labeled the other text as from "Crazy Valery."



31.     **Spoof Number.** The texts came from a spoofed number with a Miami area code and no connection to Defendant. Plaintiff had nonetheless obtained and held an emergency SNCO for nearly a year based on them. The court vacated his most recent emergency SNCO on January 3, 2025.

32.     **Immediate Police Contact.** Two days later, on January 5, 2025, Plaintiff contacted Ferraro again, asking to meet to pursue new criminal charges.  He suggested that the audio he falsely claimed Defendant 'secretly' recorded should be the basis for the criminal charge(s) he sought.

**Sam Trakas**

| | |
|---|---|
| **From:** | |
| **Sent:** | Sunday, January 5, 2025 6:46 PM |
| **To:** | Julieann Ferraro |
| **Cc:** | |
| **Subject:** | No Contact Order Vacated, seeking help |

CAUTION: EXTERNAL EMAIL

Hello Detective,

I am continuing to get notifications from people coming across audio that Valery secretly recorded and posted online of me. It is not only costing me business opportunities, but it has also cost me good will and credibility because Valery has positioned these tapes to make the audio literally sound as if she is getting raped by me. As you are aware, she was not only a willing participant in anything we did, but she was almost always the instigator of it. In this particular case, she begged me to demand her to do things via facetime. She then recorded it without my consent and posted it online positioning it as if we were in person and I was forcing her.

There has to be criminal charges against such behavior, no?

Winnebago County judge vacated the emergency no stalking order, but a plenary hearing is still expected. It was vacated over procedural stuff, not actual evidence. Her and her lawyers have managed to keep evading the actual details of the case from falling before a judge. All procedural motion after motion.

My kids are aware of this and particularly my son is worried. Before the order was in place, he was regularly worried as Valery would be posting my whereabouts and know things that made my family and I fearful. Rightfully so as I later found out she was working with a Chicago cop and his estranged wife to track my life. I can't get rid of this woman and I need your help. My last girlfriend stopped coming to Inverness with her son because Valery would be texting me what he was doing when he was here.

I do not understand how the legal system can be failing me to the extent that it has been. This is not directed at you, it is directed at the civil litigation in both Cook and Winnebago. Starting particularly with Judge Greenblatt. It seems as if you, me, my lawyers, Valery, and possibly her lawyers (maybe, maybe not) are the only people that understand what she has been and continues to do.

Can we please meet this week? Perhaps there is a route with a criminal charge(s) that can be made?

**Personal Email**

## **Plaintiff Announces Federal Filing Plan**

33. **Transfer**. Defendant filed a motion to transfer the case back to Cook County,

which was granted on 1-14-25. Plaintiff told Ferraro he would 'circle back' with a lawyer he had

previously spoken to about filing a federal defamation case.

> This has now all emerged, now with more aggression, since the Emergency No Contact was dropped.
>
> I am going to also circle back with a lawyer that I had spoken to previously about a federal lawsuit since this in from one state to the next.
>
> I can't live my whole life with a crazy woman continuing to make effort after effort to disrupt my world. All of which that includes false accusations that she either imagined all together, or has seriously flawed in her interpretation of things.

34. **Federal Case**. Plaintiff filed this federal lawsuit on March 11, 2025, while

awaiting a court date in Cook County.

## **Relevance**

35. **Why This Record Matters.** This background matters because it exposes

Plaintiff's pattern of seemingly needing to keep at least one case, and preferably more, open at

all times, regardless of merit. Each time one filing fails, he almost immediately invents another.

This federal action arises only because an emergency SNCO—improperly obtained after a

dismissal with prejudice through falsified evidence—that was held in place for nearly a year

immediately preceding this case—was finally vacated. Rather than accept that outcome, Plaintiff

indicated that he planned to 'circle back' with a lawyer and file this federal defamation case. By

then, he had exhausted state venues and simply repackaged his false allegations and grievances,

yet again, in a new venue. The sequence underscores that this lawsuit is not about redress but

about prolonging a sustained campaign of vexatious litigation.

12

**LEGAL STANDARD**

36.     To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Plausibility requires more than a "sheer possibility that a defendant has acted unlawfully." It demands factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

37.     Although the Court must accept well-pleaded factual allegations as true, it need not accept mere legal conclusions, "labels and conclusions," or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555. Conclusory assertions and speculation "stop short of the line between possibility and plausibility." Id. A complaint that fails to plausibly allege each essential element of the claim must be dismissed. Iqbal, 556 U.S. at 678–79.

38.     Where, as here, the plaintiff is a public figure, the pleading burden is even higher. The First Amendment requires the plaintiff to plausibly allege not only falsity but also that the defendant acted with "actual malice." That is, with knowledge that the statements were false or with reckless disregard for the truth. New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964); Biro v. Condé Nast, 807 F.3d 541, 544 (2d Cir. 2015). Failure to plead facts that support a reasonable inference of actual malice requires dismissal at the Rule 12(b)(6) stage.

**ARGUMENT**

**Plaintiff's Mischaracterization of Audio Cannot Sustain Any Claim**

39.     Plaintiff attempts to reframe an incriminating recording of his own abusive conduct as a "sex tape" and to spin Defendant's alleged disclosure into the revelation of private sexual

material. This effort fails under Rule 12(b)(6). The Court need not accept as true Plaintiff's

conclusory descriptions or manipulative labels. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Calling something a "sex tape" does not make it so.

40.     First, Plaintiff has not even provided the audio he refers to, leaving both Defendant

and the Court without any way of identifying the content at issue. What he submits instead

appears to be nothing more than a screenshot of an audio wave, attributed to an account that does

not exist. This is not factual proof of anything. Defendant is left to assume he refers to the same

recording in which he screamed at her to eat dog food, which Plaintiff wants to suppress not out

of concern for genuine privacy, but because it exposes his own behavior in unflattering and

incriminating terms. Plaintiff has even sought an injunction in this very case to bar Defendant

from mentioning, describing, or disclosing it. Plaintiff's refusal to submit the actual recording is

telling: the truth it would reveal is not consensual intimacy but sadistic abuse.

41.     Second, Plaintiff alleges that Defendant "manipulated" the recording to make him

"look abusive," but offers no facts to support that charge. Defendant has not edited audio in any

way. Plaintiff "looks abusive" because he is abusive, and the recording captured his own words

and conduct. Allegations of manipulation without evidence are the type of conclusory pleading

that Twombly and Iqbal hold insufficient.

42.     Third, Plaintiff's characterization of the recording as "sexual" is categorically false.

It is not a sex tape. It is not BDSM. Defendant never told Plaintiff she enjoyed BDSM, never

engaged in phone sex with him, and never consented to being degraded or dehumanized for his

amusement. The recording—again, the one Defendant can only assume Plaintiff is referencing—

reflects Plaintiff berating Defendant with cruel and degrading demands, not any mutually

rewarding or private sexual act.

43.     Finally, this tactic exemplifies Plaintiff's broader pattern of legal abuse. By relabeling recordings of his misconduct as "sex tapes," Plaintiff seeks to punish Defendant for ever speaking about his abuse and to send the unmistakable message that if she dares to describe it, he will retaliate by sexually degrading her in public filings and dragging her through endless litigation. To allow such a theory to proceed would create a dangerous precedent—one that hands abusers a ready-made strategy to recast evidence of abuse as "private sexual material" in order to silence survivors. Courts cannot endorse such a result.

44.     For all these reasons, Plaintiff's conclusory labeling of audio that is conspicuously absent from his filing cannot sustain any claim. He offers no transcript, no recording, no factual allegations of disclosure, and no proof that Defendant ever published anything. His Complaint depends entirely on speculation and a manipulative label, which is insufficient as a matter of law.

### Plaintiff's Allegations Concerning Anonymous Social Media Posts Are Conclusory and Implausible

45.     The bulk of Plaintiff's Complaint rests on posts from anonymous social media accounts. Yet Plaintiff offers no facts plausibly connecting Defendant to any of those posts. He provides no IP logs, no metadata, no account ownership records, and no evidence whatsoever that Defendant authored or published them. Bare assertions that "Defendant posted" undated random screenshots are precisely the type of conclusory allegations that courts do not accept as true. Iqbal, 556 U.S. at 678–79; Adams v. City of Indianapolis, 742 F.3d 720, 728 (7th Cir. 2014).

46.     First, as far as Defendant can determine, many of the accounts Plaintiff references no longer exist, and he does not provide sufficient information to verify that they ever did. The Complaint contains no factual basis linking Defendant to these accounts, only speculation "upon information and belief." That is insufficient under Rule 8 and Rule 12(b)(6).

47.     Second, Plaintiff's theory collapses against the obvious alternative: he is a polarizing self-promoter with many critics. By his own admission, Plaintiff maintains backup Instagram accounts for the express purpose of targeting what he calls "little buddies"—anyone who comments on his posts with less than fawning praise. He has publicly boasted of mocking, attacking, and retaliating against those individuals. Beyond Plaintiff's own accounts, there are entire forums and podcasts devoted to mocking him. As of this filing, his TikTok account appears to have been banned, while dozens of other accounts using his name and likeness remain active. Yet Plaintiff does not sue those individuals. His selective decision to blame Defendant for all negative commentary is implausible on its face. Defendant was unable to locate any of the accounts Plaintiff references. By contrast, literally countless mocking and negative comments about Plaintiff can be found across virtually all social media platforms. Comments made by over 100 different social media users, none of whom Defendant knows, were compiled and will be attached as exhibits. In addition, a selection of Plaintiff's targeted online bullying was compiled to underscore the implausibility of his claim that Defendant is the source of defamatory content. (See Exhibits 2-6).

48.     Third, Plaintiff goes so far as to allege that posts seemingly referring to Defendant must have been written by her pretending to be someone else. That assertion is baseless and abusive. Defendant has no control over what third parties post online, anonymous or otherwise. She has, in fact, discouraged others from posting in support of her precisely because she fears Plaintiff will falsely blame her. To attribute every anonymous comment to Defendant—without a single factual allegation supporting authorship—is an egregious abuse of process.

49.     Finally, Plaintiff's strategy of blaming Defendant for any negative content about him mirrors the very tactics of isolation and retaliation she has already endured. He prominently

identifies accounts that criticize him, targets individuals who merely "like" unfavorable comments, and has even forwarded third-party replies to Defendant's family in an effort to punish and intimidate her. Courts cannot permit conclusory attribution of anonymous internet posts to stand in for actual pleading of publication.

50.     For all these reasons, Plaintiff's allegations concerning anonymous social media posts fail to state a claim. They rest on speculation and manipulation, not factual content. Without non-conclusory allegations plausibly tying Defendant to the statements at issue, dismissal is required.

### Plaintiff's Remaining Counts Also Fail as a Matter of Law

51.     Plaintiff's remaining claims—for false light, public disclosure of private facts, and intentional infliction of emotional distress—are merely repackaged versions of his defective defamation allegations. Each requires elements that Plaintiff has failed to plausibly plead, and each must be dismissed.

52.     **False Light.** Illinois law recognizes false light as closely aligned with defamation. To state such a claim, Plaintiff must plausibly plead the same elements of falsity, publication, and actual malice. See Pippen v. NBCUniversal Media, LLC, 734 F.3d 610, 614–15 (7th Cir. 2013). Because Plaintiff has not plausibly pled any of the required elements, his false light claim necessarily fails alongside defamation.

53.     **Public Disclosure of Private Facts**. This tort requires that Defendant publicized private information that would be highly offensive and not of legitimate public concern. Yet Plaintiff's own extensive social media postings confirm that he has voluntarily publicized the very topics—drug use, sexual boasting, escort references, obsequious law-enforcement flattery,  and flaunted wealth—that he now labels "private." Nothing plausibly alleged here

qualifies as both private and offensive, nor has Plaintiff pled any facts attributing publication to Defendant. The claim fails at the threshold.

54. **Intentional Infliction of Emotional Distress**. To state an IIED claim, Plaintiff must allege conduct that is extreme and outrageous and that caused severe emotional distress. Speech that is constitutionally protected or that fails as defamation cannot be transmuted into "outrageous" conduct. See Hustler Magazine v. Falwell, 485 U.S. 46, 55 (1988). Plaintiff alleges no facts showing severe emotional distress beyond his dislike of criticism. His IIED claim is a transparent attempt to repackage defamation, and must be dismissed.

55. In short, Plaintiff's non-defamation claims add nothing. Each rests on the same conclusory, implausible allegations as his defamation count and therefore fail as a matter of law.

## 1. <u>Plaintiff Fails To Plausibly Allege Falsity</u>

56. Falsity is a required element of defamation under Illinois law. Pippen v. NBCUniversal Media, LLC, 734 F.3d 610, 614 (7th Cir. 2013). At the pleading stage, a plaintiff must do more than assert in conclusory fashion that he was "defamed." He must identify the specific statements alleged to be false and explain why. Iqbal, 556 U.S. at 678–79. Conclusory allegations of falsity, without factual support, do not suffice.

57. Here, Plaintiff's Complaint does not plausibly allege falsity. Rather than identifying how the challenged statements are false, Plaintiff simply declares that they defamed him. Such "labels and conclusions" fall short of the plausibility requirement. Twombly, 550 U.S. at 555.

Moreover, the Court may consider the factual record already before it in this case, including Plaintiff's own publicly available social media posts that Defendant submitted in opposition to Plaintiff's motion to proceed under a pseudonym. Those exhibits show that Plaintiff has

repeatedly portrayed himself in precisely the ways he now labels defamatory. By his own hand, Plaintiff has posted content glorifying cocaine use, boasting of his supposed sexual prowess, berating followers who referred to women in his videos as escorts, ingratiating himself with law enforcement, and flaunting wealth and success. These are not false depictions invented by Defendant or anyone else; they are central to the persona Plaintiff has voluntarily cultivated and monetized before hundreds of thousands of followers.

58.    Against that record, Plaintiff cannot plausibly allege falsity. To claim, for example, that a reference to him and cocaine is defamatory is untenable when Plaintiff himself has publicly glorified drug use. The same is true for his allegations about references to escorts, sexual boasting, police affiliation, and flaunted wealth—all subjects of his own repeated public self-representation. When the statements at issue mirror Plaintiff's chosen public image, the Complaint fails at the threshold requirement of falsity, and dismissal is required.

## II. <u>Plaintiff Fails To Plausibly Allege Malice</u>

59.    As a self-proclaimed public figure, Plaintiff bears the heavy burden of showing that Defendant acted with "actual malice," meaning knowledge of falsity or reckless disregard for the truth. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Plaintiff does not, and cannot, meet this standard. Defendant has never acted with malice towards anyone. Plaintiff does not even plausibly allege that Defendant authored the statements at issue, much less that they were published with actual malice. Conclusory assertions that Defendant harbored malice are insufficient under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Absent any factual allegations showing that Defendant knew the statements were false or acted with reckless disregard, Plaintiff's defamation claim fails as a matter of law.

### III. __Plaintiff Fails to Plausibly Allege Authorship or Publication__

60.  Apart from the defects in Plaintiff's allegations concerning anonymous social media posts, his Complaint fails at the threshold element of authorship. To state a defamation claim, Plaintiff must plausibly allege that Defendant published the challenged statements. See Adams v. City of Indianapolis, 742 F.3d 720, 728 (7th Cir. 2014). Courts routinely dismiss complaints that offer only conclusory attributions without supporting facts. Iqbal, 556 U.S. at 678–79.

61.  Here, Plaintiff provides none of the indicia that courts typically rely on to find plausibility at the pleading stage. He offers no account registration records, no metadata, no circumstantial facts linking Defendant to particular handles, and no specific admissions or identifiers. Instead, he relies almost entirely on speculation, asserting "upon information and belief" that Defendant must have been responsible. That is not enough.

62.  Plaintiff appears to point to the fact that Defendant once posted on an account called "johncerasaniisanarcissist." But that account, which primarily had posts about narcissism in general and spoke truthfully about personal experiences, has been inactive and nonexistent for well over a year. For at least the past year—and especially after receiving the threatening letter from Plaintiff—Defendant has maintained a very low profile online, refraining even from "liking" personal posts of friends and family out of fear that Plaintiff would target them.

63.  Nor has Defendant ever encouraged or directed others to post about Plaintiff. To the contrary, when contacted by individuals offering to do so in support of her, Defendant discouraged such efforts, knowing that Plaintiff would inevitably attribute them to her. Plaintiff now attempts to do exactly that: to recast any anonymous commentary about him as if it

originated with Defendant. This is not a plausible factual allegation of publication; it is an abuse of process.

64. Because Plaintiff has not pled facts plausibly tying Defendant to authorship of any of the alleged posts, his claims fail as a matter of law.

## IV. Plaintiff Fails To Plausibly Allege Damages

65. Plaintiff repeatedly asserts that he has suffered monetary damages, yet he offers no facts to support that conclusion. Conclusory allegations of harm, without factual content, are insufficient to state a claim. Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555.

66. By his own account, Plaintiff is "retired," spends his days as he pleases, and boasts of being worth "dozens of millions of dollars." He has frequently and publicly displayed stacks of cash, flaunted his wealth, and proclaimed that he is only winning  more and more as time goes on. He simultaneously claims to be a successful social media influencer, touting ever-growing numbers of followers and expanding reach. These self-promotions fatally undermine any assertion that anonymous posts have diminished his reputation or caused cognizable financial loss.

67. Plaintiff identifies no cancelled contracts, lost business opportunities, or measurable decline in revenue attributable to Defendant. Instead, as best as Defendant can discern, his damages theory rests on speculation that anonymous social media accounts—which Defendant did not create and which no longer appear to exist—might have followed well-known casinos. Plaintiff does not identify who his associates were, what business relationships existed, or how they were lost. Allegations on "information and belief" about unidentified third parties do not satisfy Rule 8 pleading standards. See Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 737 (7th Cir. 2014).

68.     As for plausibility, if any business relationship did deteriorate, it is implausible to attribute that solely to anonymous internet commentary. Plaintiff's own conduct and branding make far more obvious explanations: he publicly markets and monetizes a term he uses to deride his critics; he posts videos reducing women to props through staged undressing; and he has admitted that his incessant vulgarity, including "dropping so many f-bombs," limits his opportunities for mainstream appearances.

69.     In short, Plaintiff cannot plausibly plead that Defendant caused him reputational or financial harm. The Complaint offers only naked conclusions, contradicted by Plaintiff's own repeated boasts of wealth, success, and growing influence. That is insufficient as a matter of law.

## CONCLUSION

70.     Plaintiff has now had far more than the "one bite at the apple" to which litigants are entitled. Rather than presenting a single, coherent claim in the proper venue, he has razed orchard after orchard, devouring what he could before moving on to the next. Each time, his allegations have grown more desperate and less tethered to reality. This Complaint is no different. It reads more like a defamatory screed against Defendant than a legally cognizable defamation action.

71.     The defects are not technical. They are fatal. Plaintiff has not plausibly pled authorship, falsity, actual malice, or damages. His claims regarding audio collapse under the weight of his own manipulative relabeling. His allegations about anonymous posts amount to nothing more than speculation "upon information and belief." And his remaining counts—false light, public disclosure of private facts, and intentional infliction of emotional distress—add nothing beyond an attempt to repackage failed defamation theories.

72.     The broader context cannot be ignored. Plaintiff has created a years-long trail of failed claims across multiple venues, repeatedly attempting to weaponize laws designed to protect the vulnerable. His latest effort is no different: it is retaliatory, abusive, and calculated to silence Defendant through sheer attrition. *That is not what the federal courts exist to facilitate.*

73.     Dismissal without prejudice would be no remedy. Plaintiff views every dismissal as an invitation to file again, reshaping his narrative in yet another forum. Indeed, he filed this case only after dismissal with prejudice in a prior action. He knew his most recent case before this one would be back in front of Judge Greenblatt, who learned he went to a different venue the day after he denied his petition and later dismissed it with prejudice. Another dismissal with prejudice in state court occurred while this case proceeded. To leave the door open once more would reward precisely the sort of vexatious conduct the rules are meant to deter.

74.     The Complaint before this Court is not merely deficient; it is abusive. It should be dismissed with prejudice, without leave to amend. The record should remain open and unsealed, both to preserve the truth and to ensure that future targets of Plaintiff's tactics may see the pattern for what it is. Defendant has endured over two years of relentless, meritless litigation by the same Plaintiff. This Court should bring that campaign to an end.

WHEREFORE, Defendant respectfully requests that this Court dismiss the Complaint in its entirety, with prejudice and without leave to amend, and award such other further relief as this Court deems just and proper.

Respectfully submitted,
/s/ *Valery Ahrens*
Valery Ahrens
Pro Se Defendant
32148 237th Street
Eldora, IA  50627
312-805-1143
missvalerya@live.com

## <u>CERTIFICATE OF SERVICE</u>

I, Valery Ahrens, a pro se litigant, hereby certify that on September 2, 2025 I emailed a true and complete copy of the foregoing to Plaintiff's attorneys, Ryan Jacobson and Danessa Watkins.

**Dated:** September 2, 2025          **By:** _/s/ Valery Ahrens_